# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-KA-01414-SCT

*DUANE ROBERT HENDERSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/13/2019 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| TRIAL COURT ATTORNEYS: | MARY JANE LEMON |
| | JOEY WAYNE MAYES |
| | TAMEIKA LADANYA BENNETT |
| | AAFRAM YAPHET SELLERS |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | DUANE ROBERT HENDERSON (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALICIA AINSWORTH |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 05/27/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     Duane Henderson contacted April Newman through Facebook Messenger. April believed Henderson was offering her methamphetamine. She contacted the Richland Police Department, suggesting she could set up a controlled drug delivery from Henderson. A narcotics officer prompted her to place a recorded call to Henderson. At the officer's

direction, April arranged for Henderson to deliver her methamphetamine.

¶2. Officers then set up on eastbound Interstate 20, waiting for Henderson's Tahoe. Richland Police Department Captain Nick McClendon spotted Henderson and stopped him.[1] Henderson consented to a search of his vehicle and person. When officers searched Henderson's boots, they found a clear plastic bag containing methamphetamine.

¶3. A grand jury returned a two-count indictment charging Henderson with conspiracy to distribute methamphetamine and possession of more than two but less than ten grams of methamphetamine with intent to distribute. *See* Miss. Code Ann. § 97-1-1 (Rev. 2020) (conspiracy); Miss. Code Ann. § 41-29-139(b)(1) (Rev. 2018) (possession with intent to distribute). The grand jury also charged Henderson as a subsequent drug offender[2] and a habitual offender.[3] At trial, the parties stipulated the bagged substance in Henderson's boot

---

[1] Henderson finally stopped his vehicle inside Pearl's city limits. Captain McClendon and several other Richland officers are sworn City of Pearl law-enforcement officers under a local agreement executed by the Attorney General's Office. The defense raised no jurisdiction-based challenge.

[2] Under Mississippi Code Section 41-29-147 (Rev. 2018):

Except as otherwise provided in Section 41-29-142, any person convicted of a second or subsequent offense under this article may be imprisoned for a term up to twice the term otherwise authorized, fined an amount up to twice that otherwise authorized, or both.

For purposes of this section, an offense is considered a second or subsequent offense, if, prior to his conviction of the offense, the offender has at any time been convicted under this article or under any statute of the United States or of any state relating to narcotic drugs, marihuana, depressant, stimulant or hallucinogenic drugs.

[3] Under Mississippi Code Section 99-19-81 (Rev. 2020):

was 3.16 grams of methamphetamine. The jury found Henderson guilty on both counts.

¶4.     At sentencing, the trial judge found Henderson was a subsequent drug offender but not a habitual offender. The judge sentenced Henderson to twenty years on the conspiracy conviction. And on the possession with intent to distribute conviction—because Henderson was a subsequent drug offender—the judge exercised his discretion and sentenced Henderson to forty years, double the statutory maximum. The judge ordered the two sentences to be served consecutively to one another and any other sentence Henderson was currently serving.

¶5.     Henderson's appellate counsel filed a *Lindsey* brief, certifying there were no arguable issues for appeal. *See Lindsey v. State*, 939 So. 2d 743 (Miss. 2005).[4] In response,

---

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony unless the court provides an explanation in its sentencing order setting forth the cause for deviating from the maximum sentence, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

[4] When appellate counsel files a *Lindsey* brief, the attorney must certify he or she has scoured the record and found no arguable issues for appeal, after reviewing:

> (a) the reason for the arrest and the circumstances surrounding arrest; (b) any possible violations of the client's right to counsel; (c) the entire trial transcript; (d) all rulings of the trial court; (e) possible prosecutorial misconduct; (f) all jury instructions; (g) all exhibits, whether admitted into evidence or not; and (h) possible misapplication of the law in sentencing.

*Lindsey*, 939 So. 2d at 748.

Henderson submitted several pro se filings.[5] After conducting our mandated record review, this Court asked for additional briefing on the conspiracy charge.[6] The State, the Office of Indigent Appeals, and Henderson briefed the conspiracy issue.

¶6.     After review, we find the State failed to prove Henderson conspired with anyone to distribute methamphetamine. Viewed in the light most favorable to the State, Henderson was caught with methamphetamine on the way to conduct a buyer/seller-type drug transaction. The evidence showed April—the only possible co-conspirator—was, at most, a drug user. And her role was limited to posing as a drug user and making a recorded phone call, requesting methamphetamine from Henderson. Because the two did not conspire to *distribute* methamphetamine, we reverse and render Henderson's conspiracy conviction. But there is sufficient evidence supporting Henderson's possession with intent to distribute methamphetamine conviction. So we affirm that conviction.

## Discussion

### I.     The Conspiracy Count

¶7.     After conducting the independent review required by *Lindsey*, this Court had questions about Henderson's conspiracy conviction. We ordered the State, the Office of Indigent Appeals, and Henderson to brief whether Mississippi now recognizes unilateral conspiracies and, if so, whether the State sufficiently proved Henderson and April conspired

---

[5] Under *Lindsey*, counsel must send a copy of the brief to the defendant and advise the defendant of his or her right to file a pro se brief. *Id.*

[6] *Lindsey* also requires that we conduct an independent review of the record if any arguable appellate issues exist. If so, we require supplemental briefing. *Id.*

4

to distribute methamphetamine.

### A.    General Conspiracy Law

¶8.    Under Mississippi Code Section 97-1-1(1)(a) (Rev. 2020), it is illegal for two or more persons to conspire to commit a crime. Mississippi, unlike many other jurisdictions, does not require proof of an overt act in furtherance of the agreement to establish a conspiracy. *Peoples v. State*, 501 So. 2d 424, 428 (Miss. 1987). Rather, the agreement itself is a completed criminal offense. *Id.* And the conspiracy is a separate and distinct crime from the substantive offense that is the object of the conspiracy. *Ellis v. State*, 326 So. 2d 466, 468 (Miss. 1976). Our law is also clear that the agreement giving rise to a conspiracy need not be formal or express. *McCray v. State*, 486 So. 2d 1247, 1251 (Miss. 1986). No magic words, handshakes, winks, nods, spoken agreements, or acknowledgments are necessary. A conspiracy may instead be inferred from the circumstances, declarations, acts, and conduct of the alleged conspirators. *Id.*

### B.    Count I

¶9.    Count I charged that on or about July 19, 2018, Henderson "did willfully, feloniously and knowingly, conspire to distribute Methamphetamine, a Schedule II controlled substance, in violation of Mississippi Code Annotated Section 97-1-1 (1972)[.]" The indictment listed no known or unknown co-conspirators. And at trial, the sole drug transaction and seizure stemmed from an attempted controlled buy/receipt transaction set up by a drug-user informant acting at law enforcement's direction.

### C.    The Bilateral Approach

¶10. Our initial concern with Henderson's conspiracy conviction was that the record showed the only possible conspiracy stemmed from Henderson's drug interaction with an informant—an arrangement Mississippi has historically held precludes a conspiracy conviction.

¶11. In *James v. State*, 481 So. 2d 805, 808-09 (Miss. 1985), this Court explained that one cannot be convicted in Mississippi of conspiring solely with either (1) a law-enforcement officer, (2) an agent of law enforcement, (3) or a confidential informant. This notion is consistent with the federal courts' application of the *Sears* rule—that it is legally impossible for a two-person conspiracy to exist when one party is a government agent or informant. *See Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965).[7] This so-called "bilateral approach" flows from the conventional definition of conspiracy as "an agreement between two or more people to commit an unlawful act." *United States v. Escobar de Bright*, 742 F.2d 1196, 1199 (9th Cir. 1984). The bilateral approach applies the logic "that the act of agreeing is a group act requiring at least two people, and when one of two persons merely pretends to agree, there is neither a true agreement nor a meeting of the minds." *Palato v. State*, 988 P.2d 512, 515 (Wyo. 1999) (citing *Escobar de Bright*, 742 F.2d at 1199).

¶12. Mississippi had followed the bilateral approach for many years. But in *James*, this

---

[7] *See also* **United States v. Rios**, 171 F.3d 565, 566 (8th Cir. 1999) ("It is . . . a well-established rule that 'there can be no indictable conspiracy involving only the defendant and government agents and informers.'" (quoting **United States v. Nelson**, 165 F.3d 1180, 1184 (8th Cir. 1999))); **United States v. Moss**, 591 F.2d 428, 434 n.8 (8th Cir. 1979); **United States v. Chase**, 372 F.2d 453, 459 (4th Cir. 1967) ("[O]ne who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator." (citing **Sears**, 343 F.2d 139)).

Court acknowledged a then-emerging contrary trend:

> We are not unaware of the fact that new insights into the nature of criminal conspiracy are producing a fundamental change in the content of our nations' laws on the subject. Under what has come to be known as the unilateral approach to conspiracy, the culpability focus is solely upon the individual charged.

*James*, 481 So. 2d at 808 n.1.

¶13.    In 1985—when *James* was decided—this so-called "unilateral approach" had been adopted, in whole or in part, by a majority of states. *Id.* Under that approach, the fact a "'co-conspirator' may have been a confidential informant or otherwise ineligible for co-conspirator status is logically irrelevant to the question whether the accused has with the requisite intent engaged in the sort of anti-social conduct we label and condemn as conspiracy." *Id.*

¶14.    While recognizing the growing application of the unilateral-conspiracy approach, this Court stuck with traditional bilateral-conspiracy law. "[T]he legislature . . . possesses sole authority to create and define crimes." *Id.* (citing *Winters v. State*, 473 So. 2d 452, 456 (Miss. 1984); *McBrayer v. State*, 467 So. 2d 647, 648 (Miss. 1985); *Howell v. State*, 300 So. 2d 774, 780-81 (Miss. 1974)). And when our Court decided *James*, our legislature had without question "defined conspiracy so that it contemplates and requires two conspirators before one may be found guilty." *Id.* (citing Miss. Code Ann. § 97-1-1 (Supp. 1985)). There was no exception for conspiring with law enforcement. In short, by sticking with the bilateral approach in *James*, we simply "enforce[d] the legislative directive." *Id.*

¶15.    But in 2007, the legislature ditched its traditional bilateral view of conspiracy law.

7

That year, the legislature amended Mississippi's statutory conspiracy law to add subsection (2), which provides:

> Where one (1) or more of the conspirators is a law enforcement officer engaged in the performance of official duty or a person acting at the direction of a law enforcement officer in the performance of official duty, any remaining conspirator may be charged under this section if the alleged conspirator acted voluntarily and willfully and was not entrapped by the law enforcement officer or person acting at the direction of a law enforcement officer.

Miss. Code. Ann. § 97-1-1(2) (Rev. 2020).  This exception did not exist when this Court decided *James*.

### D.    *Unilateral Conspiracies*

¶16.    Interestingly, this Court has never addressed this 2007 legislative amendment to Mississippi's statutory conspiracy law.  But after review, it is crystal clear the legislature's 2007 amendment to Section 97-1-1(2) criminalized unilateral conspiracies.  It is now a statutory felony offense if a person "voluntarily and willfully" enters into a criminal conspiracy with a law-enforcement officer or informant and that person was not entrapped.  Miss. Code Ann. § 97-1-1(2).

#### 1.    *An agreement is still required.*

¶17.    It is a prerequisite to a conspiracy that there be a union of at least two minds.  ***Moore v. State***, 290 So. 2d 603, 604 (Miss. 1974).  And this fundament of traditional conspiracy law still rings true under Mississippi's new unilateral approach.  The legislature did not change Section 97-1-1(1)(a), which punishes conspirators "if two (2) or more persons conspire . . . [t]o commit a crime[.]"  So a corrupt agreement between two or more people still remains the essence of a conspiracy.  What the new provision, Section 97-1-1(2), did was merely

8

remove the defense of impossibility if one "voluntarily and willfully" conspires to commit a crime with a law-enforcement agent or informant who feigned his or her agreement. Miss Code Ann. § 97-1-1(2).

¶18. Now, if the culpable party had conspired, within the meaning of the definition, believing the other was with him or her (apart from the issues of entrapment), that party's culpability is not negated by the officer or informant's secret intention, as it would have been under *James*. *See James*, 481 So. 2d at 808. Thus, the State must still prove a mutual agreement to accomplish some common criminal objective—though it need not prove the officer or informant had true criminal intent. So under Section 97-1-1(2), April's role as an informant did not itself preclude the conspiracy conviction. But the State still had to prove a conspiracy existed between April and Henderson.

*2. The conspiracy evidence was insufficient.*

¶19. When testing the sufficiency of evidence, this Court views the evidence in the light most favorable to the State. *Martin v. State*, 214 So. 3d 217, 222 (Miss. 2017). We determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id.* The State receives the benefit of all favorable inferences reasonably drawn from the evidence. *Hughes v. State*, 983 So. 2d 270, 276 (Miss. 2008).

¶20. Here, the object of Henderson's charged conspiracy in Count I was to distribute methamphetamine. But there was no evidence that Henderson had conspired with April or anyone else to *distribute* the drug. Though the indictment did not name her, the record shows April was the only possible co-conspirator. Considering the evidence in the light most

9

favorable to the State, the testimony and the recorded phone call showed only that Henderson was a distributor or seller and that April (the informant) was, at most, posing as a buyer or user.

¶21. In dissent, Chief Justice Randolph opines that the State proved Henderson conspired with April to *distribute* methamphetamine and that his conspiracy conviction should be upheld. He reaches this result even though it is undisputed that April was an informant posing as a mere drug user and had by no means agreed with Henderson to distribute methamphetamine. Under Chief Justice Randolph's logic, in any routine drug transaction, both the distributor and the purchaser or recipient are always both criminally liable for conspiring to distribute drugs—even if the recipient is no more than an addict or user and had not agreed to assist the dealer in furthering drug distribution. With respect to Chief Justice Randolph, this notion ignores our conspiracy precedent and the plain text of Section 97-1-1(1) that requires that two or more persons actually "conspire . . . [t]o commit a crime"—here, methamphetamine distribution. There was certainly no conspiracy or "union" of the minds between Henderson and the informant to distribute methamphetamine. April posed as a user and Henderson intended to distribute drugs to her. Application of Chief Justice Randolph's approach would in many cases elevate a misdemeanor drug possessor's case to a felony, merely because a user of a misdemeanor amount of drugs agreed to accept or receive drugs from a dealer who was holding a bigger bag. This lack of a common purpose and the never-before-applied felony enhancement potential is certainly out of line with our conspiracy precedent, the conspiracy statute's text, and our statutory drug laws.

¶22. Federal courts have also recognized that "[a]lthough every drug deal involves an unlawful agreement to exchange drugs, . . . a buyer-seller arrangement can't by itself be the basis of a conspiracy conviction because there is no common purpose: '[T]he buyer's purpose is to buy; the seller's purpose is to sell.'" *United States v. Long*, 748 F.3d 322, 325 (7th Cir. 2014) (second alteration in original) (quoting *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir. 1978)). Those "in a buyer-seller relationship have not agreed to advance further distribution of drugs . . . ." *United States v. Brown*, 726 F.3d 993, 1001 (7th Cir. 2013). But people in drug distribution conspiracies have—"That agreement is the key." *Id.*

¶23. This is not to say buyers and sellers with a shared purpose or enterprise cannot be convicted in conspiracies to distribute drugs when the State proves evidence of their intent to distribute, resell, accept large amounts of drugs on a front-type arrangement, or otherwise proves indicia of their involvement or assistance in drug distribution. But a one-time buyer-seller transaction—particularly a controlled delivery to an informant posing as a mere user—without more, lacks the mutual agreement to distribute necessary to support a drug-distribution conspiracy. That Henderson was stopped and caught with drugs before he could deliver them is immaterial here.

¶24. Because the State did not prove Henderson agreed with April or anyone else to *distribute* methamphetamine, the evidence was insufficient to support Henderson's conspiracy conviction. We reverse and render Henderson's conviction on Count I.

## II. Henderson's Pro Se Arguments

11

¶25. Henderson briefs several additional pro se arguments, all of which lack merit. He claims the State did not sufficiently prove Count II and that his resulting conviction was against the weight of the evidence. He also argues his trial and appellate lawyers' representation was constitutionally deficient.

### A. Sufficiency of the Evidence

¶26. Again, when testing the sufficiency of the evidence, we view the evidence in the light most favorable to the State, giving the State the benefit of all reasonably drawn inferences, to determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Martin*, 214 So. 3d at 222; *Hughes*, 983 So. 2d at 276. Count II charged Henderson with possessing between two and ten grams of methamphetamine with intent to distribute. The jury heard testimony that Henderson contacted April about delivering drugs to her. A recorded phone call between April and Henderson set up the transaction. Officers then found a bag containing 3.16 grams of methamphetamine in Henderson's boot when he was stopped before delivering drugs to April. Viewed in the light most favorable to the State—and not in the light most favorable to the defendant, as Presiding Justice King views it in his separate opinion—this evidence is more than sufficient to show Henderson possessed between two and ten grams of methamphetamine with intent to distribute.

### B. Weight of the Evidence

¶27. Henderson next attacks the weight of the evidence, suggesting ulterior motives and corrupt practices by officers during his investigation, stop, and drug seizure undermine his conviction. This Court views challenges to the weight of the evidence "in the light most

favorable to the verdict." ***Williams v. State***, 285 So. 3d 156, 160 (Miss. 2019) (quoting ***Little v. State***, 233 So. 3d 288, 292 (Miss. 2017)). "[T]he jury is the sole judge of the weight and worth of evidence and witness credibility." ***Id.*** (citing ***Little***, 233 So. 3d at 292).

¶28. Henderson's defense at trial was premised in large part on challenges to police procedure, veracity, and the worth and weight of the State's evidence. But the jury simply rejected his defense. When assessing attacks on the weight of the evidence, we must view the evidence, not as the defendant prefers, but in the light most favorable to the verdict. And here, a jury heard testimony that Henderson was caught with more than two grams of methamphetamine in his boot while driving to deliver drugs. So his conviction on Count II was not against the weight of the evidence.

### C. Ineffective Assistance of Counsel

¶29. Henderson also suggests his trial and appellate counsel were ineffective. He asserts his trial counsel should have pushed that the officers framed him. But it is clear from the record that is exactly what trial counsel *did*, from lobbing attacks on the informant to suggesting the police had ulterior motives and used improper tactics. Indeed, Henderson's lawyer vigorously questioned the informant and law enforcement, suggesting the case was manufactured and the officers planted the methamphetamine at issue. But the jury was not swayed.

¶30. Henderson also argues his appellate counsel should not have filed a ***Lindsey*** brief. "The standard for considering ineffective assistance of counsel is the same for appellate performance as it is for trial performance." ***Foster v. State***, 687 So. 2d 1124, 1138 (Miss.

13

1996) (citing *Culberson v. State*, 580 So. 2d 1136, 1139 (Miss. 1990)). A defendant must show: (1) his or her counsel's performance was deficient, and (2) this deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Henderson cannot meet the second prong, particularly as it relates to Count I because this Court is reversing Count I. Furthermore, after review of the record and the issues raised in Henderson's pro se brief, we have determined those issues lack merit. Thus, Henderson cannot establish ineffectiveness or prejudice for his counsel's failing to raise frivolous issues.

**Conclusion**

¶31. As to Henderson's conviction of Count I, we reverse and render for the State's failure to present sufficient evidence of a conspiracy to *distribute* methamphetamine. We affirm Henderson's conviction and sentence on Count II.

¶32. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. RANDOLPH, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J. KING, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**RANDOLPH, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶33. "[T]he authority to say what constitutes a crime, and what punishment shall be inflicted, is in its entirety a legislative question" in Mississippi. *Gabriel v. Brame*, 200 Miss. 767, 28 So. 2d 581, 583 (1947). As such, when considering whether the elements of a crime have been proved in a given case, judicial restraint demands that we carefully scrutinize the language of our criminal statutes and compare it to the conduct of the defendant as

established by the evidence. If the elements of the crime are satisfied, we are without authority to issue any pronouncements at odds with that determination. This is a fundamental precept of our constitutional authority. Miss. Const. art. 1, § 2.

## I.       Mississippi Criminal Conspiracy Law and this Case

¶34.    A majority of this Court holds that the elements of conspiracy are set forth in Mississippi Code Section 97-1-1. Yet, inexplicably, the majority suggests that the evidence adduced at Henderson's trial was insufficient to convict Henderson considering the entire text of Section 97-1-1. Section 97-1-1(1) defines a conspiracy as when "two (2) or more persons conspire either: (a) [t]o commit a crime" or to engage in some other enumerated conduct. Miss. Code Ann. § 97-1-1(1) (Rev. 2020).

¶35.    However, the analysis does not abruptly end there. Section 97-1-1(2) modifies that definition in certain circumstances. It clearly reads:

> Where one (1) or more of the conspirators is a law enforcement officer engaged in the performance of official duty or a person acting at the direction of a law enforcement officer in the performance of official duty, any remaining conspirator may be charged under this section if the alleged conspirator acted voluntarily and willfully and was not entrapped by the law enforcement officer or person acting at the direction of a law enforcement officer.

Miss. Code Ann. § 97-1-1(2) (Rev. 2020). The entire text of Section 97-1-1 provides the complete legislative articulation of a crime of conspiracy in the state of Mississippi given the facts presented in this case.

¶36.    In today's case, the pertinent part of the statute declares that an element of a conspiracy to commit a crime is an agreement to commit a crime. *Lenoir v. State*, 224 So. 3d 85, 91 (Miss. 2017) (quoting *Cowart v. State*, 178 So. 3d 651, 666 (Miss. 2015)).

15

Henderson was indicted for conspiracy to distribute a controlled substance. The State had the burden of proving that Henderson agreed to distribute a controlled substance in order to secure a conviction. Under our criminal statutes, to distribute a controlled substance, one must "*deliver* other than by administering or dispensing a controlled substance." Miss. Code Ann. § 41-29-105(*l*) (Rev. 2018) (emphasis added). Therefore, the State's burden was to prove that Henderson entered into an agreement to deliver methamphetamine to Newman other than by administering or dispensing the methamphetamine. At the time of his arrest, Henderson was delivering methamphetamine to Newman.

¶37.    It is indisputable that Henderson contacted Newman on Facebook. Before responding to Henderson, Newman met with the Richland Police Department. A law-enforcement officer directed Newman to respond. Newman acted at the direction of the police officer, who was engaged in his official duty, and agreed with Henderson to commit a crime. As Henderson was delivering the methamphetamine to Newman, he was arrested.

¶38.    Upon this evidence, which was more than sufficient, a rational juror could, and twelve jurors did, find the elements of a crime as set forth in the Mississippi Code beyond a reasonable doubt. ***Martin v. State***, 214 So. 3d 217, 222 (Miss. 2017). The State met its burden by adducing evidence that Henderson entered into an agreement with *Newman* to deliver methamphetamine to her and was in fact delivering methamphetamine to her when he was arrested. The plain text of Mississippi's conspiracy statute was satisfied. That evidence is more than sufficient to affirm Henderson's conviction.

## II.    Distinction from the Federal Approach

¶39. Independent of arguments initially raised by the defendant, the majority author solicited arguments from the parties regarding Mississippi's conspiracy statute. Specifically, the parties were asked what effect "Mississippi Code Section 97-1-1(2) [has] on Mississippi's existing precedent that there can be no actionable criminal conspiracy when an individual 'conspires' to violate the law with only one person and that person is a government agent?" The majority confirms that Mississippi, following legislation passed in 2007, moved from a bilateral- conspiracy jurisdiction to an unilateral-conspiracy jurisdiction and finds "it is crystal clear the legislature's 2007 amendment to Section 97-1-1(2) criminalized unilateral conspiracies." Maj. Op. ¶ 16.

¶40. The majority properly articulates Mississippi law but unfortunately rejects statutory language in its opinion. Superimposing federal criminal law upon this state's criminal law jurisprudence is unwarranted. The Mississippi legislature has enacted unambiguous statutory definitions that control this case. The reasoning undergirding federal jurisprudence, *see* Maj. Op. ¶ 21, is inapposite to Mississippi law, as unilateral conspiracies are not recognized in federal courts. *See **United States v. Mahkimetas***, 991 F.2d 379, 383 (7th Cir. 1993).

¶41. Reliance on two cases from the United States Court of Appeals for the Seventh Circuit is ill-advised. Not only is the reasoning unpersuasive, the cases offer no precedential value to illuminate Mississippi's statutory law. The Seventh Circuit has decided that buyer-seller agreements do not qualify because "there must be an agreement, in addition to the underlying purchase agreement, to commit a common crime; in cases like this, it's usually an agreement that the buyer will resell drugs to others." ***United States v. Long***, 748 F.3d 322, 326 (7th Cir.

17

2014). This language cannot be found in Mississippi's statutes; there being no statutory authority, such reasoning must be rejected.

¶42. The federal cases rest on judicially created requirements: "We discuss buyer-seller relationships at such length because [such transactions] do *not* qualify as conspiracies." *United States v. Brown*, 726 F.3d 993, 1001 (7th Cir. 2013). In Mississippi, Section 97-1-1(2) focuses on the intent of only one individual "if the alleged conspirator acted voluntarily and willfully" alone, inter alia. Miss. Code Ann. § 97-1-1(2).

¶43. I concur in the majority's affirming Henderson's conviction on count II but cannot subscribe to the reversal of Henderson's conviction on count I. For these reasons, I respectfully concur in part and dissent in part.

**GRIFFIS, J., JOINS THIS OPINION.**

**KING, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶44. I agree with the majority's analysis regarding Duane Henderson's conspiracy conviction. However, because the State failed to prove beyond a reasonable doubt that Henderson possessed the requisite intent to distribute a controlled substance, this Court should reverse his conviction for possession with the intent to distribute and remand for sentencing for possession of a controlled substance. Therefore, I respectfully dissent from the portion of the majority that finds the evidence for his conviction for possession with the intent to distribute a controlled substance sufficient.

## FACTS

¶45. April Newman, the confidential informant, testified that Captain Nick McLendon had

18

initially contacted her to be an informant in exchange for his help with her boyfriend's bond and charges. She testified that Henderson contacted her over Facebook Messenger. She claimed that his messages stated that if she needed "anything" to contact him and let him know. She further testified that he gave her his phone number in the messages. She claimed that "anything" meant methamphetamine, but she did not testify as to how she knew that "anything" must mean methamphetamine. Newman further testified that she showed the messages to Captain McLendon. Captain McLendon did not recall whether he viewed any Facebook messages between Newman and Henderson. Newman stated that she deleted the messages. The messages were not produced as evidence in the case against Henderson.

¶46. Newman testified that she called Henderson and recognized his voice because she had met him "the few months before that." She did not testify that she had spoken on the phone with him before, and she indeed testified that she only received his phone number through the Facebook messages.[8] The phone call was recorded by Captain McLendon. Captain McLendon also testified that he knew the other party was Henderson because he had spoken with Henderson three or four times in the past. The party whom Newman had called did not identify himself on the phone call. Neither Newman nor the other party to the phone call mentioned drugs, getting high, an exchange of money, price, or any other specific drug reference. Captain McLendon, however, testified that drugs were "implied." The other party to the phone call asked Newman where she was staying, querying, "I guess you're staying in Rankin County, huh?" Newman responded that she was staying in Pearl with roommates.

_____

[8]In fact, approximately one minute into the phone call, Henderson asked who was calling him and then whether it was April.

She did not give the other party any specific location within Pearl where she was located. She indicated that she could leave her home, but not for long.

¶47. The other party did not agree to bring Newman anything at all, much less drugs. In fact, the other party noted that he got off of work at around 3:30 p.m. and would call Newman when he got off. Contrary to the majority's assertion that "April arranged for Henderson to deliver her methamphetamine[,]" the only thing that Newman and the other party to the phone call agreed to was for the other party to call her after he got off of work. Maj. Op. ¶ 1. Newman testified that Henderson called her again "whenever" he got off work and that the entirety of that conversation was "[t]hat he was on his way to me." Yet the first conversation made clear that Newman did not give any location regarding where she was located other than "Pearl" nor did that conversation give any indication of any location where the two were to meet.

¶48. Captain McLendon testified that Newman had initially contacted him about helping her boyfriend, and when he agreed to allow her to be a confidential informant, she then contacted him about Henderson. Captain McLendon testified that Newman and Henderson conversed around 3:00 or 3:30 p.m. and that Henderson indicated to Newman that he got off work around 4:00 p.m. that day. Consequently, he and two other officers sat on Interstate 20 to look for Henderson. He testified that he pulled Henderson over on I-20 in Pearl at around 5:00 or 5:15 p.m. Captain McLendon did not ask Henderson where he was going when he pulled him over. Captain McLendon also admitted that Henderson was not close to the vicinity of Newman when he pulled him over. Captain McLendon located a towel in

20

Henderson's vehicle. Captain McLendon testified that the towel's shape had the outline of a methamphetamine pipe, but that no pipe was located. Neither the towel nor a photograph of it was entered into evidence. He also located a bag in Henderson's boot that later tested as 3.16 grams of methamphetamine. When the bag was located, the three officers on the dashcam video cheered, laughed, and danced. Captain McLendon admitted that he had told Henderson approximately six months prior to this incident that he would "get" him.

¶49. In his pro se brief, Henderson challenges the weight and sufficiency of the evidence of any intent to distribute a controlled substance.

### ANALYSIS

### 1. *Sufficiency of the Evidence*

¶50. In reviewing the sufficiency of evidence, "this Court views the evidence in the light most favorable to the State." *Williams v. State*, 285 So. 3d 156, 159 (Miss. 2019). "We determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt[,]" and "[t]he State is given the benefit of all favorable inferences reasonably drawn from the evidence." *Id.*

¶51. It is unlawful for a person to "knowingly or intentionally . . . possess with intent to sell, barter, transfer, manufacture, distribute or dispense, a controlled substance[.]" Miss. Code Ann. § 41-29-139(a)(1) (Rev. 2018). The intent to transfer is a necessary element that the state must prove beyond a reasonable doubt. *Holland v. State*, 656 So. 2d 1192, 1195 (Miss. 1995). "A transfer is a change of possession from one person to another." *Meek v. State*, 806 So. 2d 236, 240 (Miss. 2001). "Mere suspicion of intent can not support a

21

conviction." **Holland**, 656 So. 2d at 1195. Further, where, as here, "the contraband is in an amount which a person could reasonably hold for personal use, other evidence of intent is necessary." **Roberson v. State**, 595 So. 2d 1310, 1319 (Miss. 1992).

¶52. In **Holland**, Holland was found to be carrying an amount of cocaine commensurate with personal use, an officer observed some type of unidentified exchange between Holland and another individual, Holland was in an area associated with drug usage and sales, Holland was carrying more than $200 cash and a pager, and Holland admitted selling drugs in the past. **Holland**, 656 So. 2d at 1195. The Court noted that the officer did not know what was exchanged, that it was equally likely that Holland purchased drugs rather than sold them, and that the cash, pager, and prior acts were not sufficient to prove intent to distribute. **Id.** at 1195-97.

¶53. Here, Henderson was in possession of an amount of methamphetamine commensurate with personal use. Indeed, if Captain McLendon's testimony regarding finding a towel with a pipe outline is credited, it supports the theory that Henderson intended the methamphetamine for personal use. The only other evidence of the intent to distribute consists of a phone call in which a person who is allegedly Henderson agreed to call Newman when he got off work and the fact that several hours later, Henderson was pulled over in the same town, but not in the same vicinity, as Newman. There is no evidence that Henderson knew where in Pearl Newman was even located, nor that he agreed to bring her anything. The evidence relied on by the State amounts to mere speculation by Newman and Captain McLendon that Henderson must have meant methamphetamine and that he must

22

have agreed to bring Newman methamphetamine by agreeing to call her. Such a dearth of evidence of intent, even when viewed in the light most favorable to the State, amounts to mere speculation regarding intent, and cannot support a finding of intent beyond a reasonable doubt. Viewing the evidence in the light most favorable to the State is not meant to relieve the State of its burden to prove every element beyond a reasonable doubt, and it does not provide cover for the State in cases such as this in which sufficient evidence is completely lacking and has been replaced with mere innuendo and speculation. As such, Henderson's conviction for possession with the intent to distribute must be reversed and rendered. *Id.*; *Hicks v. State*, 580 So. 2d 1302 (Miss. 1991); *Girley v. State*, 602 So. 2d 844 (Miss. 1992).

¶54. The jury in this case was instructed on the lesser-included offense of simple possession of methamphetamine.[9] Because the evidence was sufficient to establish mere possession, this Court should remand the case for proper sentencing for possession of a controlled substance. *Hicks*, 580 So. 2d at 1306; *Shields v. State*, 722 So. 2d 584 (Miss. 1998).

## 2. *Ineffective Assistance of Counsel*

¶55. I agree with the majority's conclusions that trial counsel was not ineffective, and that Henderson was not prejudiced by the actions of appellate counsel. However, I write separately to note my concerns regarding the assistance of appellate counsel. A *Lindsey* brief should be filed when a defense attorney determines after a thorough review of the record that

---

[9]The State submitted the lesser-included offense jury instructions, and the trial court noted its belief to the prosecution that agreement to such an inclusion was "wise" on the part of the State.

23

no arguable issues support an appeal. ***Lindsey v. State***, 939 So. 2d 743, 748 (Miss. 2005). A ***Lindsey*** brief was filed in this case despite members of this Court later identifying two arguable issues supporting an appeal. After supplemental briefing was ordered on one of these issues, the Office of Indigent Appeals submitted a brief with a short and general analysis totaling fewer than two pages of substance.

¶56.    Last year, the Office of Indigent Appeals, which provides indigent appellate services for the entire state, closed the year with 154 open cases divided among only six attorneys. Office of State Public Defender, *Annual Activities and Expenditures Report July 1, 2019 - June 31, 2020, available at*

http://www.ospd.ms.gov/REPORTS/Annual%20Report%20FY%202020.pdf (last visited Apr. 27, 2021). Additionally, the six "staff attorneys of IAD routinely answer questions and conduct research for trial level defenders in the field. IAD also assists with moot courts for defenders inside and outside the office preparing for oral arguments and handling oral arguments. IAD attorneys also serve on the Supreme Court committees and Mississippi Bar committees." *Id.* The report also notes that several changes that increased the workload of IAD attorneys have presented significant challenges. *Id.*

¶57.    Problems with Mississippi's public defender network, including excessive caseloads for attorneys, have been well documented. *See, e.g.*, Mississippi Public Defender Task Force, *Final Report to the Mississippi Legislature* (2018), *available at*

http://www.ospd.ms.gov/Mississippi%20Public%20Defender%20Task%20Force%20Fin al%20Report.pdf (last visited Apr. 27, 2021). The issues extend to the Office of Indigent

Appeals. Mississippi clearly needs to continue working toward adequately staffing its public defender network in order to achieve adequate defenses, both at the trial and appellate levels.

## CONCLUSION

¶58. Because the evidence was clearly insufficient to support the element of intent to distribute a controlled substance, this Court should reverse and render Henderson's conviction for possession with the intent to distribute and remand the case for sentencing for the lesser-included offense of possession of a controlled substance. Therefore, I dissent in part from the majority opinion.

**KITCHENS, P.J., JOINS THIS OPINION.**